Petitioner, Mr. Lane for Petitioner, Ms. Terry for Respondent, Mr. Pomper for the Intervenor. Petitioner, Mr. Lane for Petitioner, Ms. Terry for Respondent, Mr. Pomper for the Intervenor. Petitioner, Mr. Lane for Petitioner, Ms. Terry for Respondent, Mr. Pomper for the Intervenor. Good morning. Good morning, Your Honor. Dennis Lane for the Arkansas Public Service Commission. I've asked to reserve four minutes of my time for rebuttal. The Commission's claims of authority to take the actions that it did here don't hold up. First, I want to talk about they said that they have the right to review successor agreements under the system agreement. And, of course, that's true. But in this case, Entergy made no filing. There was nothing required by the system agreement related to the what I'll call the UP settlement amounts and the rate through which the UP settlements had been transferred to the other EOCs, this MSS3 rate was extinguished at withdrawal. So there was nothing to review. That didn't stop the Commission. The Commission, they next said that what they were doing is effectuating the UP settlement by their order. And they based that on the judge's determination, what he called a logical inference, which was, and I'm paraphrasing that, because the UP settlement extended beyond the withdrawal date and it didn't say anything about sharing benefits. Ergo, you must find that silence means that benefits should be shared post-withdrawal. First, the UP settlement agreement itself doesn't talk about sharing at all, either pre- or post-withdrawal. It's simply an agreement to settle a separate state court litigation, and it doesn't talk at all about how those amounts should be shared. So we're assuming that the agreement talks about sharing and that its silence means something. The normal course would be that you would need an express statement in the agreement, and that would dictate what obligation should follow. The next tact that the Commission takes was that it has broad authority to fashion remedies. And what they said is because the UP settlement arose at a time when everybody was under the system agreement, we must find a new way to share the benefits. That's what the remedy that they were looking for. Now, of course, FERC has authority to fashion remedies, but that authority must be exercised within the statutory framework. And if we look here, there's no basis for it. Under Federal Power Act Section 205, which would be one basis for authority, Entergy did not propose any kind of sharing arrangement as a successor agreement post-withdrawal. In that situation, the Commission doesn't have the authority to set a new rate. That was, I think you were on this, Judge Chantel, NRG marketing that came out this summer. Second, the second statutory basis would be Federal Power Act Section 206, but here there are no findings that would be required to show a Section 206 violation. In that case, you would have to show that the existing rates are unjust and unreasonable, and, in fact, the Commission said just the opposite. There were no overcharges here, and there were no payments of excessive rates. The third basis that the Commission could use, and the one that they relied on most heavily, was Section 309. And as you know, 309 is a general grant of authority to take actions. But, again, it's not an unbounded basis for taking action. It's limited to whether there was a Federal Power Act violation, which there wasn't here, or where FERC itself committed some type of an error. In that case, the Commission can use its 309 power, but neither of those situations occurred here. Finally, the Commission said, well, even though the UP settlement itself is non-jurisdictional and it was never brought to the Commission or approved by the Commission, we have authority to review it because it affects the rates. But here, that nexus was broken on withdrawal because the rate that was used for the UP settlement was what I call the MSS3 rate, the excess energy exchange rate. And at withdrawal, EIA was no longer required to offer MSS3 service, and it didn't to these parties. So the nexus was broken. There was no basis for the Commission to look at the justice and reasonableness of the UP settlement. Next, the Commission said, well, you know, we did say that you can't have an exit fee with withdrawal, but this isn't really an exit fee. And here, the Commission kind of got into some fine distinction. They said, well, this is about benefits, and really exit fees are about costs. Well, depending on which side of the table you're on, sure, there are benefits to the customers, but to EIA, there are definitely costs. And the Commission and this court, when they reviewed the system agreement and the withdrawal, they said that it's not just exit fees, that no payments, EIA is not required to make any payments or to otherwise compensate after withdrawal. So it's not simply exit fees, but any type of payment. Now, here, the way that the remedy was fashioned was based on the assumption that EIA was still in the system agreement. If you read our brief, we cite a number of points in the record where the Commission said that this is the payments are made as if EIA still was in the system agreement. So in our view, this is a cost that the Commission is applying after the agreement has ended, and thus it operates just as an exit fee would, whether it's called that or not. Now, another thing that the Commission said, this was a way of equitably allocating the UP costs and benefits. But in fact, after withdrawal, there were no costs related with UP transportation because the MSS3 rate was extinguished at withdrawal. So there are benefits flowing to the other energy operating companies, but they're not paying the costs related to that service anymore. They don't get the service, so there's no reason for them to pay the cost. But EIA is still bearing the costs related to those coal transportation. I want to address the Washita situation, which the Commission says is just like this. And so if you had a successor agreement for the Washita situation, then you must have one for the UP. They're entirely different situations. In Washita, what happened in Washita was there was a plant built. EIA bought part of it, but it didn't have sufficient transmission lines. I forget, it was either in Louisiana or Mississippi. It didn't have sufficient transmission lines to carry the energy and power from the plant to EIA, so they had to upgrade the transmission lines. And because the energy system agreement requires that whichever company's area the transmission lines cover, they pay for the cost. So because of that, EIA would have paid the cost, and it did pay the cost when it was in the system agreement. But when it left, because there was a different pricing, it no longer had to pay those costs, and it worked out an successor agreement where, in fact, it paid those amounts. Let me take you back just for one question. Sure. Discussing what the statutory authority is or is not for this. Where in your brief did you discuss Section 309? In our reply brief at page 13. In your reply brief, okay. That's why I can't find it in your main brief. Sorry, Your Honor. That's fine. I think it's our reply brief 13, and I think we talked about the TNA case. I forget what footnote number it is, but it's in the footnote on that page. I don't think page 13 has any footnotes. 13. 13. 13, I don't think it has any footnotes. Maybe I don't. My memory is not as good as it once was. Tell me about it. It is on page 13, at least in my copy, Judge Sentell. There is a footnote, Niagara-Mohawk addresses for FPA Section 309, and then we went in to discuss it. I'm sorry. I'm looking at the wrong brief. You probably have entered these reply briefs. Yes. Okay. Thank you. So, anyway, the Washita situation, there was continuing service, and there was a successor arrangement. Here, there wasn't any continuing service, as I said, with MSS 3, and Entergy did not propose a successor arrangement. I just want to touch a minute on the difference between the 2014 study and the 2010 study. The commission adopted the 2010 study, and we're arguing that the 2014 study should be used. Now, the commission based it on its view that the witness, Mr. Crowley, was using a different contractual practice from what EIA had used, and that when he did the 2014 study, he varied from their contractual practice, which was to have long-lasting transportation arrangements. But if you read his testimony, and it's at JA 1698 through just the part that I'd like you to read, you can read the rest of it, but JA 1698 through 1715, you'll see that what he actually was doing, he was taking the UP settlement as it is, and he was comparing, well, when we set it up this way, how does it compare with what the market is doing today? And when he did the study in 2010, he compared, and there are two parts to the UP settlement, he compared the first part, the first year, with the BNSF 2009 bid price, which was what the long-standing contract was. In the 2010 study, he again did that, but for the three years, what's called the new delivery contract, he used 2012 actual bids from UP and BNSF to adjust his earlier findings from 2010, and that's what we think that's the right way to do it, that you should use actual costs. If there are no questions, thank you. All right, thank you. Ms. Perry? Good morning. Rhona Perry for the Commission. In the orders that are under review, the Commission was reviewing Intergy Arkansas's 205 filing of successor arrangements following its withdrawal from the Intergy System Agreement. In reviewing those successor arrangements, the Commission found that it was unjust and unreasonable and unduly discriminatory for the Intergy Arkansas to withdraw, following withdrawal from the system agreement, to continue to receive and retain all of the benefits of the settlement of the Union Pacific settlement from 2008. So just to interrupt you very briefly, it would not be your position that FERC needs the authority of 309 or 206 in order to do what it did here, that it could do it under 205? Yes, Your Honor. All right, thank you. And under 205, the Commission found that those successor arrangements were insufficient and that they did not provide for the continued sharing among all of the operating companies of the benefits of the Union Pacific settlement. And that is because the Commission found that the Union Pacific settlement was negotiated by Intergy Arkansas in 2008 as a member of the system agreement for the benefit of all of the operating companies. And there was no basis on which, following withdrawal, Intergy Arkansas should justly and reasonably be allowed to retain all of the benefits of the settlement when the settlement was negotiated for all of the operating companies collectively. And, therefore, the Commission required that there be some mechanism for continuing to share those settlement benefits. And the mechanism that the Commission chose, or the mechanism that the Commission affirmed that the administrative law judge chose following the hearing, was to adopt Mr. Cain's methodology to calculate the settlement benefits as though Intergy Arkansas had remained in the system agreement and use that methodology to determine what the benefits should be to the operating companies post-withdrawal. And in calculating that, the Commission also correctly affirmed the ALJ's determination that the 2010 analysis of Mr. Crowley was the most probative analysis as it valued the settlement as of 2011 for a multi-year contract which was consistent with Intergy's contracting practices and correctly rejected the subsequent 2014 analysis which relied on subsequent market information that would not have been known to Intergy at the time they entered into the market. If there are no further questions, I will... Thank you. Mr. Pomfrey. May it please the Court? David Pomfrey from the Mississippi Commission. In New Orleans' deferred, Mississippi stood with Arkansas, Intergy, and the Commission in opposing exit fees.  Because the remedy here, which Mississippi sponsored and the New Orleans case carved out, was no exit fee. It grew from a settlement that liquidated claims against Union Pacific. The claims were raised on behalf of and belonged to all of the Intergy companies, not just Arkansas. Intergy's case against Union Pacific specifically relied on all the company's damages as incurred pursuant to the energy exchange of the system agreement. Had the claims remained in litigation when Arkansas withdrew, they'd have stayed with all the damaged companies. So Arkansas' exit should not give it sole ownership of those claims' liquidated value. The settlement didn't extinguish rate-payered claims to fair allocation of that value. What it did do was lock the railroad into low pricing for 2011 through 2015. That spared Intergy from having to buy transport for that period later, circa 2010, at that market's higher prices. By applying the study that Intergy presented in 2010, just when Intergy would have been shopping for forward transport, FERC fairly valued the settlement. Arkansas argues for a lower per-ton value based on a 2014 study. But as FERC found with ample record support, that was a hindsight study that treated Intergy as implausibly clairvoyant. You know, the concept, as Mr. Lane was explaining, they'd broken it to two periods, a one-year period and a three-year period. The reason they did that was to assume that for the three-year period they'd have gone back to market. Well, they wouldn't have because they'd have contracted for a longer period. They didn't know the prices were going to fall. They couldn't time the market. Now, in allocating that value, FERC was even-handed. Some witnesses supported allocating about 80% of the settlement value to Louisiana and Mississippi and Texas because during the derailment period, 2005-2006, they suffered about 80% of the damages.  FERC used 2013 rather than derailment period dispatch patterns to do the allocation. It withheld interest. It excluded production cost equalization effects. And it applied the settlement's per-ton value to actual coal tonnage. You can see the bottom line in the sealed record at R218, page 8, the Intergy compliance filing. It shows that FERC's remedy touched less than 10% of the settlement value, leaving Arkansas with the majority. Weighing the equities was FERC's daily work, and FERC steered an equitable middle course. Now, to be sure, FERC's even-handedness would be no defense if FERC exceeded its authority. Arkansas argues that no existing filed rate specified post-withdrawal sharing. But FERC can change jurisdictional rates and arrangements that affect them to eliminate discrimination. FERC suspended the transition arrangements filing that started this case, so it had that authority under 205D, which says that suspension entails broad remedial powers. Those include the Section 309 authority to perform any and all acts as it may find necessary or appropriate to make the transition fair. FERC referred to Niagara-Mohawk, which is a Section 309 reference. They also include all the powers to change related arrangements that Section 206 recites. And Section 205 makes an express cross-reference to the Section 206 powers, so by acting 205, FERC could do prospectively from the suspension anything it can do under 206. But again, as FERC argues, the ultimate source of the authority is 205. That's correct. And 206 and 309 are essentially explanatory by reference as to what it can do under 205H. That's right. Under 205, FERC can do anything prospectively from the suspension that it can do under 206 prospectively from an order. The statute says so. So once it's found discrimination, as it did, there was an express finding in this case, unlike, say, where FERC found that without a change, the situation would have been unduly discriminatory. Now, what FERC did is it construed the settlement in a way that saved it from being unduly discriminatory, deeming that it intended the resulting benefits to be equitably shared throughout its duration. The settlement was a contract affecting both the system agreements and entities' jurisdictional filing of transition arrangements. FERC, therefore, could enforce and adjust that contract and its relationship to the system agreement and its aftermath, and it could construe the contract and alter the interview arrangements as necessary to make the combined effect non-discriminatory. So having made an express finding that the existing situation without change would be unduly discriminatory and preferential, FERC properly insisted that the transition measures include equitable sharing. All right. Thank you. Does Mr. Lane have any time left? Mr. Lane did not have any time left. All right. Why don't you take one minute? Okay. Thank you. In answer to your question, Judge Santel, if they did rely on 205, this Court's ruling in NRG marketing this summer indicated that if there was no proposal from the utility, the Commission doesn't have the power under 205 to issue a new rate. There was no proposal from NRG. The FERC argues and the intervener argues that if there is a finding of discrimination, then the cross-references under, I believe it's subsection H, would then become applicable, so they could do what is available under 206 and 309 at that point. If there was such a finding, but I urge you to look at J.A. 87, paragraph 11, where the Commission said there were no excessive rates charged to the customers and EIA did not overcharge the rate. They didn't find there was discrimination. I just want to make one other point, if I may. The claim was made that the 2014 study was not based on actual. If you look again, I point you to 1698 to 1715 of the J.A., you read the testimony. He looked at actual bids from UP and BNSF that were made in 2012 that he couldn't include in the 2010. Not only that, but the UP settlement, what they called the new delivery contract, the three-year contract, was amended as a result of those bids. It was proper to look at that, and the Commission should have considered it. Thank you.
judges: Henderson, Wilkins, Sentelle